*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

RANA RADHA,

        Plaintiff/Counterdefendant-Appellee,

v

AHMED MOHAMMED,

        Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
December 22, 2025
9:59 AM

No. 372150
Wayne Circuit Court
LC No. 2023-100057-DM

---

RANA RADHA,

        Plaintiff-Appellee,

v

AHMED MOHAMMED,

        Defendant-Appellant.

No. 374999
Wayne Circuit Court
LC No. 2023-100057-DM

---

Before: ACKERMAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

This action arises from the divorce of plaintiff-appellee-mother, Rana Radha (plaintiff), and defendant-appellant-father, Ahmed Mohammed (defendant), following a bench trial. In Docket No. 372150, defendant appeals as of right from the judgment of divorce entered on August 12, 2024. In Docket No. 374999, defendant also appeals as of right from the trial court's order of March 10, 2025, granting plaintiff $15,421.08 in attorney fees.[1] We affirm.

---

[1] The appeals have been consolidated. *Radha v Mohammed*, unpublished order of the Court of Appeals, entered May 20, 2025 (Docket Nos. 372150 and 374999).

-1-

# I. BACKGROUND FACTS

The parties married in July 2016. Two children were born during the marriage, "La" and "Le." At the time the judgment of divorce was granted in 2024, La was six years old and Le was four years old. Custody was the primary issue the trial court was asked to resolve.

Plaintiff lived in Canada before marrying defendant and moving to Dearborn, Michigan. The parties agreed that defendant, a psychiatrist, would work to support the family. Defendant earned significant income. Although plaintiff pursued higher education in Canada and considered a career outside the home, she agreed to stay at home with their children and care for the household.

During the marriage, plaintiff often visited with her family members in Canada. In 2019, when there was a conflict between the parties, plaintiff left Dearborn and spent time in Canada with La at her family's home. In 2020, during the COVID-19 pandemic, defendant agreed that plaintiff and La should go to Canada for their own protection because defendant was exposed to COVID-19 in his work. Plaintiff gave birth to Le in Canada in 2020 and returned with the children to Dearborn shortly thereafter. Both children have dual citizenship.

According to plaintiff, defendant became controlling and abusive over the course of their relationship. He restricted plaintiff's ability to leave the family home and tracked how much money she spent. They had frequent arguments over plaintiff's spending, although plaintiff's father sent her money on a monthly basis. Plaintiff also was often criticized by defendant and his family, particularly his mother, about how she cared for the children and the family home. Defendant's parents, who lived close by in a house he owned, often intervened in the parties' disagreements.

On December 20, 2022, the parties had multiple arguments that made plaintiff realize that the marriage was over. Earlier that day, the parties argued over whether they should buy La a snowsuit. Defendant's parents came over and they argued about plaintiff's homemaking skills as well as her spending. Plaintiff testified that defendant told her that she was not respectful enough to live in his home, that he did not want her there anymore, and that her father should pick her up. Later that night, the parties again argued when plaintiff tried to retrieve some photographs from defendant. He refused to give them to her. Defendant turned the photographs over to plaintiff only after the police were called.

The next day, plaintiff took the children to stay in Canada with her family, where they remained for about three months. Plaintiff filed for divorce and also moved to change the children's domicile to Canada.

At trial, the primary issue was custody, including whether plaintiff should be able to change the children's legal residence and move them to Canada. Addressing this issue, the trial court found that the statutory factors supported plaintiff's request to change the children's domicile to Canada because: (1) the move had the capacity to improve the quality of life for the children and plaintiff, (2) the court was not convinced that plaintiff was requesting the move to defeat or restrict defendant's parenting time; (3) changes to the parenting-time schedule preserved and fostered the relationship between defendant and the children; (4) there was no evidence that plaintiff was motivated by a desire to secure a financial advantage concerning a support obligation; and

(5) defendant's pattern of emotional abuse supported the change of domicile. The court found that plaintiff met her burden of proof that a change of residence was merited. The court also found that the children had an established custodial environment with plaintiff. Defendant had requested that the court grant him sole legal and physical custody, but the court did not find that there was clear and convincing evidence to change custody to defendant.

## II. DOCKET NO. 372150

### A. CHANGE OF DOMICILE

Defendant argues that the trial court erred in finding that the factors in MCL 722.31(4) supported plaintiff's motion to change the children's domicile. We disagree.

"In a child custody dispute, 'all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.' " *Pennington v Pennington*, 329 Mich App 562, 569-570; 944 NW2d 131 (2019), quoting MCL 722.28. "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington*, 329 Mich App at 570.

A trial court's decision on a motion for a change of domicile is reviewed by this Court for an abuse of discretion and the trial court's factual findings on the factors in MCL 722.31(4) are reviewed under the "great weight of the evidence" standard. *Rains v Rains*, 301 Mich App 313, 324; 836 NW2d 709 (2013). "An abuse of discretion is found only in extreme cases in which the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will or the exercise of passion or bias." *Id*. (quotation marks and citation omitted).[2]

Where a child's custody or parenting time is governed by a court order, the trial court may not change the child's legal residence except in compliance with MCL 722.31. MCR 3.211(C)(3). MCL 722.31 codifies the process for changing a child's domicile when proposing to move the child more than 100 miles from the child's residence:

> (1) A child whose parental custody is governed by court order has, for the purposes of this section, a legal residence with each parent. Except as otherwise provided in this section, a parent of a child whose custody is governed by court order shall not change a legal residence of the child to a location that is more than 100 miles from the child's legal residence at the time of the commencement of the action in which the order is issued.

---

[2] Although the standard for finding an abuse of discretion was changed in *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) (adopting the standard of "outside the range of reasonable and principled outcomes"), child-custody cases continue to apply the standard in *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959). See *Maier v Maier*, 311 Mich App 218, 221-223; 874 NW2d 725 (2015).

* * *

(4) Before permitting a legal residence change otherwise restricted by subsection (1), the court shall consider each of the following factors, with the child as the primary focus in the court's deliberations:

(a) Whether the legal residence change has the capacity to improve the quality of life for both the child and the relocating parent.

(b) The degree to which each parent has complied with, and utilized his or her time under, a court order governing parenting time with the child, and whether the parent's plan to change the child's legal residence is inspired by that parent's desire to defeat or frustrate the parenting time schedule.

(c) The degree to which the court is satisfied that, if the court permits the legal residence change, it is possible to order a modification of the parenting time schedule and other arrangements governing the child's schedule in a manner that can provide an adequate basis for preserving and fostering the parental relationship between the child and each parent; and whether each parent is likely to comply with the modification.

(d) The extent to which the parent opposing the legal residence change is motivated by a desire to secure a financial advantage with respect to a support obligation.

(e) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

The trial court must engage in the following four-part analysis before changing a child's domicile to a location more than 100 miles away:

First, a trial court must determine whether the moving party has established by a preponderance of the evidence that the factors enumerated in MCL 722.31(4), the so-called *D'Onofrio* [*v D'Onofrio*, 144 NJ Super 200, 206-207; 365 A2d 27 (1976), adopted in *Henry v Henry*, 119 Mich App 319, 323-324; 326 NW2d 497 (1982)] factors, support a motion for a change of domicile. Second, if the factors support a change in domicile, then the trial court must then determine whether an established custodial environment exists. Third, if an established custodial environment exists, the trial court must then determine whether the change of domicile would modify or alter that established custodial environment. Finally, if, and only if, the trial court finds that a change of domicile would modify or alter the child's established custodial environment must the trial court determine whether the change in domicile would be in the child's best interests by considering whether the best-interest factors in MCL 722.23 have been established by clear and convincing evidence. [*Rains*, 301 Mich App at 325.]

-4-

Defendant challenges the trial court's findings on four of the above factors. Defendant argues that the trial court erred in its findings involving MCL 722.31(4)(a), which asks "[w]hether the legal residence change has the capacity to improve the quality of life for both the child and the relocating parent."

The trial court found that the move to Canada would benefit plaintiff and the children because: (1) plaintiff's support group was in Canada, including family and friends, who could make her a happier parent; (2) the children were familiar with Canada, were already citizens, and qualified for free healthcare; and (3) plaintiff seemed to have better employment and educational opportunities in Canada. Defendant asserts that the evidence addressing the employment and educational benefits of moving to Canada was speculative and against the great weight of the evidence. He claims that plaintiff only had one position available at the time of trial and she did not plan to work after the divorce. However, plaintiff's intention to continue her education supported the trial court's finding on this factor. Plaintiff explained how it was less expensive for her to continue her education in Canada. Even if she was not yet working, she needed to finish her education before she could commit herself to her career.

Defendant questions the trial court's findings that plaintiff would be happier in Canada because of the family she had there when she also had a sister nearby in Toledo, Ohio. This ignores plaintiff's testimony that she felt safer and calmer when she was back home in Canada. She described not being able to develop a community in Michigan, largely because of defendant's controlling behavior. Although plaintiff's sister in Ohio lived closer, there was still a significant drive for plaintiff and this sister could not provide the same level of support as having additional family members in close proximity. No error has been shown with the court's findings on this point.

Defendant also questions whether plaintiff established that the children's lives would improve by moving to Canada. Plaintiff believed that Canada was safer than Dearborn and that the school systems were better for the children. Additionally, the children would receive free healthcare in Canada. Both Canada and Dearborn have Muslim and Arabic communities. Defendant has not shown error with the court's findings regarding the quality of life for plaintiff and the children. Plaintiff has an established community in Canada and will have better healthcare and educational support there for herself and the children. While defendant claims that plaintiff failed to offer evidence to support this finding, she testified about her and the children's lives in Canada. Because the trial court found that her testimony was credible, we defer. "This Court gives deference to the trial court's factual judgments and special deference to the trial court's credibility assessments." *Brown v Brown*, 332 Mich App 1, 9; 955 NW2d 515 (2020). In particular, on the question of whether plaintiff would be happier in Canada, the trial court properly accepted her testimony that her life would improve by moving.

Defendant also contends that transporting the children between Dearborn and Canada is burdensome. The drive is almost four hours and involves crossing the United States-Canada border each way. This factor also involves the children's quality of life, MCL 722.31(4)(a). The court was aware of the problems the parties may encounter commuting between their homes. While the commute is not ideal, the evidence otherwise showed that the children will have a better overall quality of life in Canada and the stress of the additional commuting distance every other weekend is a fair tradeoff for the move.

Defendant submits that the trial court erred in finding that the following factor in MCL 722.31(4)(b) favored plaintiff:

> The degree to which each parent has complied with, and utilized his or her time under, a court order governing parenting time with the child, and whether the parent's plan to change the child's legal residence is inspired by that parent's desire to defeat or frustrate the parenting time schedule.

The trial court found both parties generally followed the court's orders governing parenting time. The court also found that plaintiff was not moving the children to defeat defendant's parenting time, but she intended to meet him halfway to exchange the children.

Defendant asserts that this finding was erroneous, relying on plaintiff's report to the police of the children's injuries in December 2023 and January 2024, which included a Children's Protective Services (CPS) investigation. Although defendant argues that plaintiff's decisions were irrational under the facts, the witnesses who testified about those incidents actually supported plaintiff's actions. Indeed, plaintiff was unsure of how to proceed because the children's injuries occurred when she was not present. The actions taken were reasonable under the circumstances. While the children were subject to some contact with law enforcement and CPS as a result of plaintiff's actions, it was necessary for those steps to be taken to determine what happened to cause their injuries.

Defendant has not shown that the court's findings on this factor are erroneous. The overall facts showed that plaintiff did not ignore the court's orders on parenting time to limit defendant's interaction with the children, even though she wanted to limit his time as much as possible. Plaintiff respected the court's orders and cooperated with defendant to support his parenting time.

Defendant also claims error with the court's findings on MCL 722.31(4)(c), which provides:

> The degree to which the court is satisfied that, if the court permits the legal residence change, it is possible to order a modification of the parenting time schedule and other arrangements governing the child's schedule in a manner that can provide an adequate basis for preserving and fostering the parental relationship between the child and each parent; and whether each parent is likely to comply with the modification.

The trial court found that the change in the parenting-time schedule, eliminating two weeknight visits every other week for three hours in favor of an extended summer visit, gave defendant an adequate basis for preserving and fostering his relationship with the children.

On this factor, defendant claims that the court erred because the evidence showed that he was integrally involved in the children's lives, so that the change to an extended summer schedule would hinder his relationship. The facts, however, do not support that argument. While defendant supported the family financially, it was clear that he was not the one providing the children's care on a daily basis, including attending their medical appointments. When parenting-time visits began, defendant expected that plaintiff would provide the children's necessities for their time with

him.  Defendant did not immediately obtain those items, but looked to plaintiff to provide them. He also expected plaintiff to provide for the majority of the children's care while they were still living together, even when he was at home.  After the parties separated, defendant did not honor the children's bedtime routine and left daily care of the children on the last day of his weekends for plaintiff to handle.

The facts showed that defendant's involvement with the children was not nearly as extensive as plaintiff's role.  The trial court correctly found that the modified schedule would benefit defendant, particularly when his involvement with the children seemed to be limited because of his work obligations.  Therefore, this factor favored the change in domicile.

The final factor challenged by defendant, MCL 722.31(4)(e), requires that the trial court consider any "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child."  The court found that this factor favored the move to Canada because of defendant's history of emotional abuse of plaintiff.  The court also found that defendant attempted to intimidate plaintiff, including threatening to call the police, engaged in name-calling, treated her as if she was a servant and a child, punishing her for behavior of which he did not approve, and repeatedly telling her that she should return to her father.

Defendant contends that both parties were at fault for their arguments, but the record showed that defendant continued to be the one who attempted to control plaintiff throughout their relationship.  Defendant and his family treated plaintiff as their servant.  Defendant knew this and did not attempt to protect her.  Plaintiff's conduct was more reactive, while defendant was the aggressor.  Because of the involvement of defendant's family, plaintiff was forced to defend herself against defendant and his family.  It was apparent that plaintiff felt more secure in the presence of her parents and some distance from defendant because of their history of abuse.  The move to Canada was better for her because of the abuse.  Defendant has not shown that the trial court erred in its findings on this factor.  Accordingly, the record shows that plaintiff established by a preponderance of the evidence that the factors in MCL 722.31(4) supported changing the children's domicile to Canada.

## B.  CUSTODIAL ENVIRONMENT

Defendant next argues that the trial court erred in finding that the children had an established custodial environment with plaintiff.  We disagree.

"Whether an established custodial environment exists is a question of fact to which the great weight of the evidence standard applies." *Kubicki v Sharpe*, 306 Mich App 525, 540; 858 NW2d 57 (2014).  The trial court's findings regarding an established custodial environment should be affirmed unless the evidence clearly preponderates in the opposite direction. *Pennington*, 329 Mich App at 570.

MCL 722.27(1)(c) defines an "established custodial environment":

The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort.  The age of the child, the physical

environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered.

This Court offered an alternative description of established custodial environment in *Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008):

> An established custodial environment is one of significant duration in which a parent provides care, discipline, love, guidance, and attention that is appropriate to the age and individual needs of the child. It is both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence.

An established custodial environment can exist with both parents if the children look to both the mother and father for guidance, discipline, the necessities of life, and parental comfort. *Id*. at 707.

In *Sabatine v Sabatine*, 513 Mich 276, 286; 15 NW3d 204 (2024), our Supreme Court recently summarized what a trial court must do when its decision may modify an established custodial environment:

> When considering an important decision affecting the welfare of the child, the trial court must first determine whether the proposed change would modify the established custodial environment of that child. In making this determination, it is the child's standpoint, rather than that of the parents, that is controlling. If the proposed change would modify the established custodial environment of the child, then the burden is on the parent proposing the change to establish, by clear and convincing evidence, that the change is in the child's best interests. Under such circumstances, the trial court must consider all the best-interest factors because a case in which the proposed change would modify the custodial environment is essentially a change-of-custody case. On the other hand, if the proposed change would *not* modify the established custodial environment of the child, the burden is on the parent proposing the change to establish, by a preponderance of the evidence, that the change is in the child's best interests. [Quoting *Pierron v Pierron*, 486 Mich 81, 92-93; 782 NW2d 480 (2010).]

In *Sabatine*, 513 Mich at 288, the Supreme Court also clarified that the court must decide the question regarding an established custodial environment on the circumstances that exist at the time the court issues its decision, not on a custodial environment that no longer exists. However, in some cases, the custodial environment that existed before the parents separated might be relevant to whether an established custodial environment exists at the time the trial court enters a judgment of divorce. *Id*. at 288-289.

> The trial court's ruling on this issue was:

> If an established custodial environment exists, the party seeking to change it must establish by the heightened "clear and convincing evidence" standard that a change in custody is in the best interests of the minor child. See MCL 722.27(1)(c); *Parent v Parent*, 282 Mich App 152, 155; 762 NW2d 553 (2009). In the absence

of an established custodial environment, the Court is free to award custody to either parent in accordance with the child's best interests as shown by a preponderance of the evidence. *Baker v Baker*, 411 Mich 567, 579; 309 NW2d 532 (1981); MCL 722.23.

> In the instant matter, the Court finds that there is an established custodial environment with Plaintiff. Both parties agree that they had specific roles in their marriage before their separation. Plaintiff acted as the primary caregiver of the children, while Defendant worked full-time to provide for the household financially. The Court finds Plaintiff's testimony describing her caregiving role to be convincing. Plaintiff testified that she maintained the bedtime routine for the children. The parties agreed that prior to their separation Plaintiff generally took the children to their medical and dental appointments. After the parties separated, the Plaintiff initially took the children with her to Canada where she remained the primary caregiver.

The trial court added in a footnote that plaintiff's role as the primary caregiver was apparent because after the parties separated, defendant had to ask plaintiff to prepare clothing for La to wear to school because he did not know what she would wear. Defendant also asked plaintiff what snacks and food La liked to take to school.

Defendant contends that the court's finding of an established custodial environment only with plaintiff was against the great weight of the evidence. He maintains that he shared parenting duties with plaintiff when they resided together, but that overstates the facts. He had some parental duties, such as helping put the children to bed and sometimes preparing them food. However, he apparently only comforted Le when she was upset. Defendant treated La differently. He rarely attended the children's medical appointments and he did not attend any dental appointments until after the separation. Defendant's role in assisting with the children's medical care before the separation was limited to participating when there were significant events.

The parties admitted that they made an agreement when they married that plaintiff's role was to care for the children and the home while defendant worked to financially support the family. After the separation, it took defendant some time to learn what his own children wore and ate on a regular basis. If he had been regularly involved as an integral part of their lives before the separation, he would not have had to ask plaintiff for that information.

The trial court focused on the custodial environment before the parties separated due to the young age of the children. Additionally, the evidence showed that the custodial environment did not significantly change after the parties separated because the children continued to look to plaintiff as their caregiver. Defendant has not shown that it was error for the court to focus on the custodial environment that existed while the parties were together because it was relevant to helping decide if defendant had an established custodial environment with the children after the parties separated. *Sabatine*, 513 Mich at 288-289.

Defendant has not shown that the trial court's findings on the established custodial environment are against the great weight of the evidence when the evidence does not clearly preponderate in the opposite direction. *Pennington*, 329 Mich App at 570. The evidence showed

that the children looked to plaintiff for guidance, discipline, the necessities of life, and parental comfort. *Sabatine*, 513 Mich at 291. Modifying how defendant spent his parenting time with the children because of the move did not involve significant changes to the children's established custodial environment with plaintiff. *Id.* at 290-291.

Given that the move to Canada would not change the children's established custodial environment, plaintiff was only required to prove by a preponderance of the evidence that the move was in the children's best interests. *Sabatine*, 513 Mich at 286. As discussed later, plaintiff also showed that the move was in the children's best interests.

Defendant also states that the trial court shifted the burden of proof to him on the issue of an established custodial environment, which amounts to clear legal error. In *Rains*, 301 Mich App at 331, this Court explained that a trial court's clear legal error generally requires remand for further consideration under the proper legal framework. He contends that the trial court wrongly put the burden on him to prove that he had an established custodial environment with regard to the change of domicile. Defendant has erroneously interpreted the trial court's ruling.

The trial court's ruling also addressed whether it should change the established custodial environment under the "clear and convincing" evidence standard. However, we conclude that this part of the trial court's opinion was included to address defendant's request for sole legal and physical custody of the children. On that issue, defendant had the burden of proof to change the established custodial environment that existed with plaintiff in order for defendant to be granted sole custody. *Sabatine*, 513 Mich at 286. Contrary to defendant's argument, the trial court did not require that defendant prove an established custodial environment existed to prevent the children's domicile from changing. Defendant has not shown that the trial court erred by placing the burden on him to support a change of domicile; instead, he misinterpreted the trial court's ruling. Thus, the trial court did not err in ruling that the children had an established custodial environment with plaintiff only.

## C. BEST INTERESTS

We also conclude that the trial court did not err in finding that the best-interest factors supported plaintiff's request to move the children to Canada.

A trial court's findings regarding each of the best-interest factors of MCL 722.23 are reviewed by this Court under the "great weight of the evidence" standard. *Bofysil v Bofysil*, 332 Mich App 232, 245; 956 NW2d 544 (2020). "A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction." *Pennington*, 329 Mich App at 570. Therefore, the trial court's findings regarding each of the best-interest factors should be affirmed unless the evidence clearly preponderates in the opposite direction. *Kubicki*, 306 Mich App at 542.

Here, plaintiff was required to show that the move to Canada was in the children's best interests by a preponderance of the evidence. *Sabatine*, 513 Mich at 286. This required the trial court to review the factors in MCL 722.23:

As used in this act, "best interests of the child" means the sum total of the following factors to be considered, evaluated, and determined by the court:

(a) The love, affection, and other emotional ties existing between the parties involved and the child.

(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any.

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

(d) The length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity.

(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(f) The moral fitness of the parties involved.

(g) The mental and physical health of the parties involved.

(h) The home, school, and community record of the child.

(i) The reasonable preference of the child, if the court considers the child to be of sufficient age to express preference.

(j) The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent.

(k) Domestic violence, regardless of whether the violence was directed against or witnessed by the child.

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

Defendant challenges factors (a), (b), (c), (d), (f), (g), (h), (i), (j), and (k). We find no error with the trial court's findings.

In factor (a), the trial court found that this factor favored plaintiff because she had stronger emotional ties to the children. Disinterested witnesses confirmed that she was bonded to the children. The court was also troubled when defendant was offered additional parenting time over

a holiday break, but he refused to spend any additional time with the children because he did not receive as much time as he requested.

Defendant submits that the court erred by focusing on plaintiff's role as the primary caregiver during the marriage to decide this factor. This Court has held that factor (a) should not be scored because one parent stayed home to care for the child, thereby developing a closer bond because of the time spent together. See *Bofysil*, 332 Mich App at 246. We do not conclude that the court based its finding on this factor solely on plaintiff's role as the children's primary caregiver during the marriage. The evidence the court cited to support its decision involved more recent events as well. The court did not base its decision solely on plaintiff's caregiving role since the children's births. The court cited defendant's refusal to spend more time with the children during a recent holiday break as relevant in deciding this factor. This finding was not against the great weight of the evidence when defendant was simply not as close to the children both during the marriage and after the parties separated.

The trial court found that factor (b) favored plaintiff as well. While the parties were both capable of offering the children love, affection, educational support, and religious exposure, the court found that defendant's frequent yelling, angry outbursts, and abusive behavior were not appropriate role-modeling for the children's development.

Defendant argues that this factor was wrongly decided because plaintiff was also culpable in the parties' arguments. He further claims that plaintiff was paranoid that defendant would mistreat the children when there was no support for that fear. Instead, plaintiff told the children that she would call the police when they misbehaved. Defendant also asserts that plaintiff did not support the children's education when she missed school while in Canada with the children and at other times. Moreover, plaintiff did not always drop La off at school in a timely fashion.

Defendant has not shown that this factor was wrongly decided. While the evidence showed that plaintiff also had imperfections as a parent, they paled in comparison to defendant's abusive conduct and, at times, disinterest in the children's development.

The court found factor (c) was even because defendant earned a significant income and plaintiff was offered two jobs in Canada, but her earning potential was uncertain. With regard to the children's medical appointments, plaintiff handled the appointments during the marriage, but defendant was attending medical and dental appointments after the separation. Both parties were meeting the children's material and medical needs.

Defendant argues the court erred because plaintiff chose not to work after she moved to Canada. However, she is completing her education and, because she does not have spousal support for a significant time period, she likely will begin working once she completes her education. The court did not err in considering that plaintiff has the capacity to materially provide for the children in the future, even if she was not currently working.

Defendant claims that plaintiff should not have been treated equally because he blames her for La's dental issues. There was no evidence offered to prove that La's dental problems were caused by plaintiff. This argument lacks merit.

Defendant also relies on the children's history of injuries, which he attributes to plaintiff not properly caring for the children. There again was no evidence that the children's injuries were caused by plaintiff or that she did not properly provide them with necessary medical care.

The trial court found that factor (d) favored plaintiff because living with her family in Canada would provide a more stable environment for the children. In contrast, defendant's yelling and outbursts contributed to an unstable environment. Additionally, La no longer felt comfortable around her paternal grandmother following a CPS investigation into child abuse involving the grandmother that ultimately was not substantiated.

Defendant claims that plaintiff was as responsible for the unstable home environment, referring to an incident when plaintiff bit defendant's arm while the children were in the car with them. He also notes that the children grew up in Dearborn, while they only visited Canada sporadically.

This factor was not wrongly decided. Defendant relies on an isolated incident involving plaintiff and ignores that his conduct over the years created an unstable environment for the children. His relatives contributed to that instability by their criticism of plaintiff. La, in particular, did not feel safe around defendant's mother. In contrast, there was no evidence that plaintiff's relatives created a similarly hostile environment.

With regard to the moral fitness of each parent, factor (f), the court again found that this factor favored plaintiff. The court's reasoning was that defendant was emotionally abusive to plaintiff by trying to control her, treating her like a servant, and calling her names, as previously discussed when the court considered domestic violence under MCL 722.31(4)(e).

Defendant again states that the allegations against him were not credible and that plaintiff caused the children harm because of her frequent police reports, which reflected on her lack of moral fitness. This argument lacks merit for the reasons previously discussed regarding the evidence of domestic violence. The court found that plaintiff's testimony was credible about the abuse she suffered. There also was corroborating evidence which showed how poorly defendant and his family treated plaintiff. This factor was not wrongly decided in plaintiff's favor.

Addressing factor (g), involving the parties' mental and physical health, the court found this factor even when the parties did not challenge each other's fitness. Defendant now claims that the trial court should have considered plaintiff's alleged paranoia because she made multiple police reports when the children had unexplained or suspicious injuries. We find no error in the trial court's refusal to consider plaintiff's reporting of suspicious incidents as a reflection of her mental fitness.

The trial court found that factor (h) was neutral because both children did not have any academic or educational issues at the time of trial. Defendant submits that the court did not take into account the children's community contacts. Although the children grew up in Dearborn, had doctors there, and attended a mosque, there was no evidence that they had strong connections outside of the marital home. Given their young ages, it is clear that the move to Canada would not have a great impact on their connections to Dearborn, but they would make new attachments in Canada. This factor does not favor defendant.

-13-

In the court's opinion, it originally found that factor (i) was not applicable because of the children's ages (six and four years old). Defendant argued that the court should have interviewed La, so the court conducted an interview of La in July 2024. After interviewing La, the court concluded that she was not able to express a reasonable preference between the parties.

Defendant argues that the trial court legally erred by not interviewing La before the court made its findings in June 2024. He claims that this error could not be rectified by the court's interview after it made its findings. Defendant, however, misinterprets the holding of the case he cites for his argument. In *Quint v Quint*, ___ Mich App ___, ___;___ NW3d ___ (2024) (Docket No. 368002); slip op at 6-9, this Court held that it was error when the trial court failed to conduct an interview of the parties' seven-year-old child to determine the child's reasonable preference. The Court found that this was plain error that affected substantial rights in the case and required a remand for the trial court to reconsider the best-interest factors. *Id*.

In the case at bar, the trial court corrected its error by conducting an interview of La and reopening the proofs. Thereafter, the court found that La was not of sufficient age to express a preference. Because the trial court conducted the required interview and made its findings on the child's ability to express a preference, this case is distinguishable from *Quint*. Once the court found that La was not able to express a preference, it was not required to revise its opinion on custody. The court interviewed La and concluded that she could not express a preference before the court entered the judgment of divorce in August 2024.

Defendant also argues that the court could not conduct La's interview via Zoom because MCR 3.210(A)(4) provides that, in domestic relations matters, "[t]estimony must be taken in person, except as provided in MCR 2.408(B) or when the court may otherwise allow testimony to be taken by telephone in extraordinary circumstances, or by videoconferencing technology under MCR 2.407 and MCR 2.408."

MCR 3.210(C)(5) establishes the process courts should follow to consider the child's preferences:

> The court may interview the child privately to determine if the child is of sufficient age to express a preference regarding custody, and, if so, the reasonable preference of the child. The court shall focus the interview on these determinations, and the information received shall be applied only to the reasonable preference factor.

It is apparent that the requirement that witnesses testify in person, except in limited circumstances, applies to trials and hearings. In contrast, the procedure for learning a child's preference involves an *in camera* interview. When a judge conducts an interview of a child, the judge must assess the child's ability to express herself, but the interview is not as comprehensive as evaluating witness testimony in a trial or hearing. See *Surman v Surman*, 277 Mich App 287, 297-298; 745 NW2d 802 (2007) ("It is well established that to protect a child from the trauma and distress of choosing between his or her parents in open court, a trial court may exclude the child's parental preference testimony from trial and instead interview the child in camera."). Simply put, MCR 3.210(C)(5) does not require that a judge conduct an in-person interview of a child, where that may not be practical. Defendant has not shown that the trial court could not rely on its

interview of La because it was conducted on Zoom. For these reasons, the trial court did not err in its findings on this factor.

The court found that factor (j) was neutral because it determined that the parties were able to communicate about the children using an application on their telephones. The court also gave plaintiff credit for agreeing to meet defendant halfway for parenting-time exchanges.

Defendant argues that this factor should have been decided in his favor because of the parties' disagreements over medical, therapy, and dental appointments. He also cites the problems the parties had early on in the separation because plaintiff took the children on trips to visit relatives without notifying him. Although both parties had incidents where conflicts or differences arose, defendant was not without blame, such as his refusal to participate in therapy with La and changing the contact information with the children's dentist. The parties' history made it challenging to work together for the children's benefit. In light of defendant's participation in or escalation of the parties' disagreements, the court's neutral consideration of this factor was not erroneous.

Defendant also emphasizes that the court found that there was no domestic abuse between the parties and, for this reason, plaintiff adversely impacted his relationship with the children when she went to Canada or Ohio to escape defendant. That is not accurate. The court found that there was insufficient evidence to conclude that there was physical domestic violence, but it did find that there was emotional abuse by defendant against plaintiff. Likewise, there is no merit to defendant's argument that plaintiff failed to encourage the children's close relationship with him because she left the relationship at times for her emotional well-being.

The trial court again relied on its findings for domestic violence under MCL 722.21(4)(e) to conclude that factor (k) favored plaintiff. Defendant contends that this factor was wrongly decided because the court did not attribute any fault to plaintiff for the parties' arguments. As already discussed, there is no basis for finding that plaintiff was responsible for the domestic violence in the marriage, but that it was defendant's behavior that resulted in his emotional abuse of plaintiff. This factor was properly decided in plaintiff's favor.

Defendant has not shown error with any of the trial court's findings regarding the best-interest factors. Accordingly, we affirm the trial court's ruling that the children's domicile was properly changed to Canada when the move was in the children's best interests.

### D. THE TRIAL COURT'S BIAS AND REASSIGNMENT TO ANOTHER JUDGE

Defendant claims that the trial court exhibited bias against him and displayed passion for plaintiff's position throughout the trial. Therefore, he asserts that the trial court's custody rulings amount to an abuse of discretion and should be set aside by this Court. But "[a]n abuse of discretion is found only in extreme cases in which the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will or the exercise of passion or bias." *Rains*, 301 Mich App at 324.

"In a child custody dispute, 'all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue.' " *Pennington*,

329 Mich App at 569-570, quoting MCL 722.28. After reviewing the entire record and defendant's arguments on this issue, there is no indication that the trial court ignored the evidence or decided this case on passion or bias for or against a party. The overall evidence supported the trial court's findings. As explained, the trial court arrived at the correct conclusions when it applied the necessary standards for determining whether the children should be able to move to Canada with plaintiff. Defendant has not shown that the trial court's findings on the parties' actions and relationship were erroneous and support setting aside the trial court's opinion regarding custody.

Defendant also requests that this matter be reassigned to another judge on the ground that the trial judge exhibited bias against him. Because defendant has not shown error requiring reversal with the trial court's rulings or any bias exhibited by the trial court, there is no need for us to remand this matter and have a new judge address matters raised in this appeal. *Cassidy v Cassidy*, 318 Mich App 463, 510; 899 NW2d 65 (2017).

## III. DOCKET NO. 374999

### A. ATTORNEY FEES

Plaintiff moved for an award of postjudgment attorney fees because there was additional litigation after the judgment of divorce was entered and her litigation costs increased. The trial court awarded plaintiff $15,421.08 in attorney fees in its order of March 10, 2025. We affirm that order.

This Court summarized the standard of review for awards of attorney fees in divorce cases in *Cassidy*, 318 Mich App at 479:

> "We review for an abuse of discretion a trial court's award of attorney fees in a divorce action." *Richards v Richards*, 310 Mich App 683, 699; 874 NW2d 704 (2015). An abuse of discretion occurs when the result falls outside the range of principled outcomes. *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010). "[F]indings of fact on which the trial court bases an award of attorney fees are reviewed for clear error." *Richards*, 310 Mich App at 700. "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Gates v Gates*, 256 Mich App 420, 432-433; 664 NW2d 231 (2003).

Plaintiff moved for attorney fees under MCR 3.206(D), which provides:

(D) Attorney Fees and Expenses.

> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.

> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that

(a) the party is unable to bear the expense of the action, including the expense of engaging in discovery appropriate for the matter, and that the other party is able to pay . . . .

The trial court found that defendant was largely responsible for the additional litigation that was filed after the divorce judgment was entered. The court explained why it believed that plaintiff lacked the ability to pay her own fees:

The issue of ability to pay is also an important one. The Defendant argues that Plaintiff, because she testified at trial that [s]he had some job offers, that she should be considered to—that that needs to be considered at this stage. And that the Court should also consider the spousal support that she will be receiving, but for the most part has not received to this point.

As far as the issue goes regarding job opportunities, the Court did consider her testimony about that. She did indicate that she had some job opportunities. It is expected that she will be employed and working in Canada. However, if she's chosen at this point to engage in further studies in order to obtain some other type of employment, that's something that she has a right to do. And the reality of the situation is that at this point she does not have regular income other than child support and spousal support which are designed to assist her in meeting her living expenses, not in paying for attorney fees.

A party—according to *Hanaway v Hanaway*, [208 Mich App 278, 298-299; 527 NW2d 792 (1995)], the [C]ourt of [A]ppeals indicated [that] a party should not be required to invade assets to satisfy attorney fees when the party's relying upon the same assets for support.

And so the Court does believe that there is a—an inability by the Plaintiff to pay these significant attorney fees as a result of such [a] large amount of post-judgment litigation.

The court also found that defendant had the ability to pay plaintiff's fees:

The Court also believes that the Defendant does have the means to pay the fees requested. He is making far greater than [plaintiff] is. Even if we take into account the imputation of income that the parties agreed for [plaintiff] to have for purposes of child support purposes, that's only $30,000 a year. Her—with the attorney fees that are being requested are more than half of that amount alone. And, again, that amount is supposed to be regular income that she uses to pay for regular expenses, not for additional attorney fees required by significant and protracted post-judgment litigation.

So the Court does believe that an award of attorney fees is appropriate under MCR 3.206(D)(2)(A), that [plaintiff] is unable to bear the expense of this continued litigation and that the other party is, does have an ability to pay.

Defendant first argues that the evidence did not support the court's ruling that plaintiff lacked the ability to pay her fees. But there was no dispute that she was a student and not working. Any payments she received went to support herself and the children. There was also a delay in concluding the distribution of the marital assets. The trial court refused to require plaintiff to invade her assets to pay her counsel.

Defendant's primary argument is that plaintiff had testified earlier that she had job offers in Canada, suggesting that she would immediately work upon relocating. However, the trial court included in its ruling that it would impute income to plaintiff. Even though she was not working, the court considered that she had the ability to work and could earn about $30,000. There was no reason for the trial court to find that she could earn more than that at the time it was asked to rule on the motion for attorney fees. Defendant has not offered any support for the argument that plaintiff was voluntarily reducing her income in order to recover attorney fees. It is apparent that she was completing her schooling and could then focus on developing her career.

Defendant also contends that plaintiff should have been judicially estopped from requesting attorney fees because she was not awarded any of her fees before the divorce judgment was entered. In addition, he relies on her trial testimony that she had two job offers in Canada. Judicial estoppel is used to prevent a party from raising contradictory arguments in different phases of a case. *Spohn v Van Dyke Pub Sch*, 296 Mich App 470, 479; 822 NW2d 239 (2012).

Again, the trial court rejected this argument because MCR 3.206(D) allows a party to move for attorney fees "at any time." This motion for fees was specifically brought because of the extensive postjudgment litigation, which the court found was primarily attributed to defendant. There was no reason for the trial court to bar the motion because of what occurred at trial. The issue of attorney fees during the trial and in the postjudgment proceedings involve different considerations. For instance, by prolonging this litigation with multiple postjudgment proceedings, defendant has added to the original legal costs incurred by plaintiff, which she may have been able to pay through the entry of the judgment of divorce. On the facts of this case, there was no reason for the trial court to apply judicial estoppel to bar plaintiff's motion for attorney fees.

Defendant also argues that the court erred in ruling that he had the ability to pay plaintiff's fees. The trial court gave defendant the opportunity to explain why he was unable to pay the amount of fees requested by plaintiff, given defendant's other obligations. Defendant does not dispute the figures cited by the trial court in its finding that defendant had additional income each month that allowed him to pay plaintiff's attorney fees. While defendant disputed that he could pay the amount of fees requested, we do not find error with the trial court's decision that defendant had the ability to pay plaintiff's attorney fees.

## B. EVIDENTIARY HEARING

Defendant also claims that error occurred because the trial court approved the amount of fees requested by plaintiff without holding an evidentiary hearing. We note that defendant did not ask that the court hold an evidentiary hearing and he offered only vague arguments on why the amounts requested should not be granted. Defendant did not offer substantive grounds to challenge the amount of fees requested. Defendant's failure to request an evidentiary hearing or properly

challenge the reasonableness of the proposed fees waives appellate review of the issue. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 292-293; 14 NW3d 472 (2023).

Nonetheless, even if the trial court was obligated to consider holding an evidentiary hearing without an explicit request by defendant, error has not been shown. The party requesting attorney fees has the burden of proving that they were incurred, MCR 3.206(C)(2), and that they are reasonable. *Reed v Reed*, 265 Mich App 131, 165-166; 693 NW2d 825 (2005). When requested attorney fees are contested, it is incumbent on the trial court to conduct a hearing to determine what services were actually rendered and the reasonableness of those services. *Id*. at 166.

In *Cassidy*, 318 Mich App at 486-488, this Court explained that where a party does not challenge either the hourly rates or the work performed with regard to a motion for attorney fees, no error occurs from failing to conduct an evidentiary hearing if the parties created a sufficient record for the trial court to review the issue and the court explained the reasons for its decision. In light of the sufficient record and the trial court's explanation of its reasons, no error occurred from the failure to hold an evidentiary hearing. *Id*. at 492.

As discussed later, the trial court gave its reasons for approving of plaintiff's request for attorney fees and explained what it relied on to make its decision. Because defendant did not properly challenge the reasonableness of the amount of fees charged by plaintiff's attorney or the billable hours, or specifically request an evidentiary hearing, there was no need for the court to conduct an evidentiary hearing before awarding attorney fees.

## C. REASONABLENESS OF THE AMOUNT OF FEES AWARDED

To support her request for attorney fees, plaintiff produced both the billings from her attorney and the State Bar's 2023 Economics of Law Survey. The trial court was able to review the reasonableness of the fees on the basis of the information produced by plaintiff. Specifically, it determined that the hourly rate of $350 and the hours expended were reasonable for an attorney fee award of $15,421.08. Defendant now raises an argument he did not present in the trial court, regarding the trial court's failure to consider how many of plaintiff's motions were successful. Plaintiff's motion was brought under MCR 3.206(D)(2)(a), which involves her claim that she was unable to bear the cost of the additional litigation in this matter, while defendant had the ability to pay her fees. It should be noted that an award under this subsection does not require consideration of whether the party requesting fees prevailed on other substantive matters. *Colen v Colen*, 331 Mich App 295, 307; 952 NW2d 558 (2020). Here, defendant argues that the only factor he believes that the trial court should have discussed in its ruling, but did not, was "the amount in question and the results obtained." However, defendant did not raise any substantive reason before the trial court on why this factor barred plaintiff from receiving the full amount of fees she requested. We may consider the argument waived. *Tolas Oil*, 347 Mich App at 292-293.

Nonetheless, there is little support for the argument that plaintiff's postjudgment motions lacked any merit. The trial court granted plaintiff's request to enroll both children in counseling because the parties could not agree on counseling (for a second time). Her first motion for attorney fees was denied without prejudice because it lacked supporting documentation. The other two

motions defendant raises involved plaintiff's efforts to get defendant to abide by the terms of the judgment. It is apparent that plaintiff did not file frivolous motions.

Even if the trial court had addressed this argument, plaintiff did not file the majority of the motions after the judgment was entered. Moreover, the few she filed were either successful or at least not frivolous. Again, it was largely because defendant refused to cooperate that plaintiff was required to seek relief in the trial court and, therefore, she continued to incur attorney fees. Defendant has not shown that the trial court erred in finding that the attorney fees requested by plaintiff were reasonable.

Affirmed.

/s/ Matthew S. Ackerman
/s/ Stephen L. Borrello
/s/ Anica Letica